NOT DESIGNATED FOR PUBLICATION

No. 123,103

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
VALDIE T. BARNETT.

MEMORANDUM OPINION

Appeal from Ellsworth District Court; CAREY L. HIPP, judge. Opinion filed July 16, 2021.
Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Dwight R. Carswell*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: Valdie T. Barnett appeals the Ellsworth County District Court's judgment committing him to treatment at Larned State Hospital as a sexually violent predator. Barnett contends that the trial court erroneously shifted the burden of proof to him and, without the burden-shifting, the evidence was insufficient to support the judgment. We disagree and affirm.

FACTS

As this is the third appeal in Barnett's civil commitment proceedings, the history of the case is well known to the court. See *In re Care & Treatment of Barnett* (*Barnett I*), No. 115,298, 2016 WL 5853086 (Kan. App. 2016) (unpublished opinion); *In re Care & Treatment of Barnett* (*Barnett II*), No. 117,277, 2017 WL 5504861 (Kan. App. 2017)

1

(unpublished opinion). An exhaustive review of the procedural history of this case is unnecessary.

Since 1996, when he was 13 years old, Barnett has bounced in and out of juvenile and adult correctional facilities for serious crimes including aggravated sexual battery, aggravated indecent liberties with a child, and aggravated battery. In 2004, The State charged Barnett in two separate complaints for committing indecent liberties with two separate victims. In Rice County District Court case 04 CR 165, Barnett ultimately pleaded guilty to an amended count of attempted indecent liberties with a child. The trial court imposed a 68-month prison sentence. In Ellsworth County District Court case 04 CR 160, Barnett ultimately pleaded guilty to an amended count of indecent solicitation of a child, and the trial court imposed a 30-month sentence, which ran consecutively to the sentence imposed in Rice County.

Just before Barnett's anticipated release from prison in 2012, Dr. Jane Kohrs, a clinical psychologist conducted a psychological evaluation of Barnett to determine Barnett's need for further treatment. In her report, Dr. Kohrs diagnosed Barnett with antisocial personality disorder. Based on the results of some actuarial tools and review of Barnett's history, Dr. Kohrs opined that Barnett's risk of sexual recidivism was significant. The State sought civil commitment of Barnett as a sexually violent predator under the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01, et seq. Rebecca Farr, who held a temporary psychologist license, conducted the forensic evaluation for the State under the supervision of Dr. John Reid, a licensed psychologist. Barnett obtained an independent psychological evaluation from Dr. Robert Barnett. The trial was held in March and June 2013.

The trial court found Barnett to be a sexually violent predator and ordered his commitment to Larned State Hospital for treatment. Barnett appealed to this court, challenging the qualifications of Dr. Kohrs. This court noted that Dr. Kohrs did not

2

conduct the forensic evaluation required by the Act and that Barnett had not challenged Farr's qualifications on appeal. Nevertheless, this court concluded that the trial court has specifically discounted Farr's testimony and reasoned that Dr. Kohrs' evaluation did not comply with the procedural requirements of K.S.A. 2015 Supp. 59-29a05(d). The court therefore reversed the commitment order and remanded the case for further proceedings. *Barnett I*, 2016 WL 5853086, at *3.

On remand, Barnett sought release from civil commitment as a sexually violent predator. Over the State's objection, the trial court released Barnett and dismissed the civil commitment proceedings against Barnett. The State appealed, arguing that the Kansas Court of Appeals' reversal of the commitment proceedings involved a procedural error and that the State could seek civil commitment of Barnett under proper procedures. This court reversed the trial court's dismissal, declaring the order null and void. The court remanded the case to the trial court to permit the State to have Barnett properly evaluated and to proceed with civil commitment proceedings. *Barnett II*, 2017 WL 5504861, at *7. When the State reinstituted civil commitment proceedings, Barnett voluntarily turned himself in. He had been released for about 17 months.

The State retained Dr. Michael Flesher to conduct the forensic psychological examination of Barnett. Like earlier evaluations, Dr. Flesher's evaluation concluded that Barnett suffered from antisocial personality disorder that made him likely to engage in repeat acts of sexual violence. Dr. Flesher concluded that Barnett exhibited the criteria for commitment as a sexually violent predator under the Act. Barnett retained Dr. Bruce Nystrom, who concluded that Barnett had dependent personality disorder and concluded that Barnett did not pose a substantial risk of sexual recidivism. At a pretrial hearing, the trial court ruled that it would not rely on the transcripts from the previous commitment hearings.

The court held a new trial in late November 2019. Along with expert testimony from Dr. Flesher and Dr. Nystrom, the court heard evidence from Barnett and his mother about Barnett's progress since committing the 2004 offenses, focusing heavily on Barnett's conduct during his 17-month release from confinement.

The trial court requested proposed findings of fact and conclusion of law from both parties. On February 7, 2020, the trial court issued its memorandum decision, finding Barnett to meet the criteria for civil commitment as a sexually violent predator and ordering his commitment to Larned State Hospital for treatment.

Barnett timely appeals the trial court's commitment order.

ANALYSIS

As defined by K.S.A. 2020 Supp. 59-29a02(a), a sexually violent predator is "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence and who has serious difficulty in controlling such person's dangerous behavior." Before civilly committing Barnett for treatment as a sexually violent predator, therefore, the State was required to prove (1) Barnett had been convicted of or charged with a sexually violent offense; (2) Barnett suffers from a mental abnormality or personality disorder; (3) Barnett is likely to commit repeat acts of sexual violence because of the mental abnormality or personality disorder; and (4) Barnett has serious difficulty controlling his dangerous behavior. *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011). The State carried the burden of establishing each of these requirements beyond a reasonable doubt. K.S.A. 2020 Supp. 59-29a07(a) ("The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator."); *In re Care & Treatment of Hay*, 263 Kan. 822,

4

842, 953 P.2d 666 (1998) ("[T]he State's burden under the Act is proof beyond a reasonable doubt.").

Although Barnett challenges the trial court's conclusion that he is a sexually violent predator within the meaning of the Act, he limits his challenge to the fourth element—proof that he has difficulty controlling his dangerous behavior. He has abandoned any arguments with respect to the other elements by not briefing challenges to those elements. See *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 191, 106 P.3d 483 (2005). In challenging the evidence supporting the fourth element, Barnett contends that the trial court's findings on this point shifted the burden to him to prove that he could control his disorder. Without this burden-shifting, Barnett contends the record contains insufficient evidence to support the trial court's conclusion that he had difficulty controlling his personality disorder.

*Burden-Shifting*

Civil commitment constitutes a restraint on liberty that implicates due process. *In re Care & Treatment of Quillen*, 312 Kan. 841, 850, 481 P.3d 791 (2021) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 [1992]; *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 [1979]). Thus, shifting the burden of proof of one of the four requisite elements improperly relieves the State of its statutorily imposed burden of proof and undermines the statutory requirements for commitment. *State v. Colbert*, 26 Kan. App. 2d 177, 182, 987 P.2d 1110 (1999) ("An evidentiary presumption in a jury instruction deprives a defendant of due process when it effectively relieves the State of its burden of proof.").

Whether the trial court has improperly shifted the applicable burden of proof is a question of law. *In re Estate of Moore*, 53 Kan. App. 2d 667, 681, 390 P.3d 551 (2017). An appellate court conducts plenary review over questions of law. *In re G.M.A.*, 30 Kan.

5

App. 2d 587, 593, 43 P.3d 881 (2002) (determination of which party bears burden of proof is question of law subject to unlimited appellate review). An appellate court also conducts unlimited review of the legal effect of the trial court's written decision. See *In re Estate of Einsel*, 304 Kan. 567, 579, 374 P.3d 612 (2016) ("The interpretation of a journal entry, like the interpretation of all written instruments, presents a question of law over which an appellate court exercises de novo, or unlimited, review.").

In setting out the legal issues for consideration, the trial court properly noted that the State had the burden to prove beyond a reasonable doubt four elements. After considering evidence presented on each element, the trial court concluded that the evidence established beyond a reasonable doubt that Barnett met each criterion for classification as a sexually violent predator. In discussing the fourth criterion—whether Barnett has serious difficulty controlling his dangerous behavior—the trial court acknowledged the evidence that Barnett was out in the community for 17 months without a reported sexual offense. The trial court posed the rhetorical question whether this evidence presented reasonable doubt about Barnett's ability to control his antisocial personality disorder and then answered the question based on the evidence, or absence of it, in the record.

Barnett argues that the trial court's comments about the lack of evidence suggest that he had some obligation to demonstrate that he could control his dangerous behavior, thus shifting the burden of proof to him. Though the trial court noted the absence of evidence showing Barnett took meaningful action to control his personality disorder, the trial court's comments did not suggest that Barnett had any obligation to produce any evidence or to prove he could control his personality disorder. The trial court's comments explain why the trial court did not find Barnett's 17-month release significant when weighed against the psychological evidence suggesting that Barnett would have difficulty controlling his behavior.

"The Court finds that Mr. Barnett has failed to show any insightful changes in his attitudes and orientations. While the Court sympathizes with Mr. Barnett in that he was released from custody in November 2017 without any agency support, Mr. Barnett's attempts at reformation since his release, as evidenced by his own testimony, have been nominal. Mr. Barnett has failed to update his 2010 relapse prevention plan, even after acknowledging that his 2010 relapse prevention plan was no longer appropriate. During his time in the community, Mr. Barnett failed to obtain any sex offender treatment or counseling and failed to avail himself of offered counseling by his pastor. Mr. Barnett's 'wait and see' approach to necessary treatment is of great concern to this court. It shows a lack of insightful changes in his attitudes and orientation. With 4 prior convictions of sexually violent offenses, it is clear that Mr. Barnett should have taken advantage of sex offender treatment options. Instead, Mr. Barnett testified that he was waiting to see what happened in the appeal, hoping it would be in his favor. Mr. Barnett did acknowledge his high risk areas and situations, but his plan consisted almost entirely of avoiding those areas and relying on an adult from his support system to chaperone him. Mr. Barnett has no plan should a relapse happen. Given Mr. Barnett's testimony on his future intent to leave his parent's home, move to another city and live on his own, it is obvious to the Court that Mr. Barnett's foresight is lacking. Mr. Barnett has no adequate long-term plan and has not adequately dealt with any issues which lead to the determination he was at high risk of reoffending. There is no reason for the Court to believe that Mr. Barnett has taken any permanent measures to control his dangerous behavior. Given Mr. Barnett's diagnosis of antisocial personality disorder coupled with his extensive history of sexually violent offenses as well as multiple disciplinary offenses, including one for possessing pornography (which was admitted by Mr. Barnett), all lead the Court to find that he has serious difficulty in controlling his dangerous behavior."

In summary, the trial court concluded that the actuarial tools demonstrated that Barnett posed a high risk of sexual recidivism. While Barnett lived in the community for 17 months without apparent incident, the trial court concluded that this evidence alone did not undermine the statistical data because the evidence presented at trial demonstrated that Barnett did not implement strategies to help him control his antisocial personality disorder. He did not seek treatment or counseling. During the 17-month period, he lived

7

with his mother and avoided situations in which he might relapse unless accompanied by an adult who would hold him accountable.

The trial court's reliance on Barnett's avoidance of high-risk situations should not be interpreted as advocating that Barnett purposefully place himself in high-risk situations to prove his ability to control his deviant behavior. Rather, the trial court's comment should be interpreted as giving less weight to Barnett's conduct while at liberty than might be warranted in other circumstances, such as if Barnett established and maintained regular counseling sessions to help him control his antisocial personality disorder. The trial court's decision did not shift the burden of proof to Barnett. The trial court properly held the State to prove each element beyond a reasonable doubt.

*Sufficiency of the Evidence*

When a person subject to civil commitment as a sexually violent predator challenges the sufficiency of the evidence supporting the commitment, an appellate court considers the evidence in a light most favorable to the State to determine if a reasonable fact-finder could have concluded beyond a reasonable doubt that the person is a sexually violent predator within the meaning of the Act. *In re Care & Treatment of Cone*, 309 Kan. 321, 332-33, 435 P.3d 45 (2019).

In challenging the evidence in support of the trial court's judgment, Barnett focuses primarily on evidence from his expert witnesses and evidence favorable to him. We note, however, Barnett's focus on evidence favorable to him is contrary to the limitations imposed on an appellate court to consider the evidence in the light most favorable to the prevailing party. Here, the prevailing party is the State.

Both Dr. Flesher and Dr. Kohrs diagnosed Barnett with antisocial personality disorder. Antisocial personality disorder manifests itself in a pattern of attitudes and

8

conduct that differs from societal or cultural norms by violating the rights of others in aggressive, irresponsible, and manipulative ways. One of the hallmarks of this disorder is a lack of remorse or unwillingness to take responsibility for one's actions. In Dr. Flesher's opinion, Barnett's antisocial personality disorder frequently manifested itself in sexual misconduct. Dr. Flesher stated that antisocial personality disorder does not have a cure but that treatment has been effective to change behavior and attitudes. While Dr. Nystrom did not diagnose Barnett with antisocial personality disorder, he did conclude that Barnett needed others to assume responsibility for major areas of life. Dr. Nystrom also agreed that Barnett's history of sex offenses represented "a pervasive pattern in disregard for violation of the rights of others."

Again, taking the evidence in a light most favorable to the State, the evidence does not support a conclusion that treatment succeeded in causing permanent change in Barnett's behavior and attitudes. Throughout the case, Barnett has demonstrated a lack of remorse for his actions and an unwillingness to take full responsibility for his actions.

After interviewing Barnett before he was released from prison, Dr. Kohrs expressed concerns that Barnett did not acknowledge the full extent of his misconduct. He acknowledged conduct related to his convictions. With respect to his first juvenile charge, Barnett only acknowledged touching the victim who reported the offense, even though substantial evidence indicated that Barnett touched three girls inappropriately at a swimming pool. Barnett downplayed his role in the event, characterizing the touching as accidental or compartmentalizing his offensive behavior. With respect to the second juvenile incident, Barnett again downplayed his involvement, suggesting that the charge stemmed from a one-time incident when the victim reported multiple inappropriate contacts by Barnett. He downplayed his involvement.

Dr. Kohrs also indicated that Barnett's conduct after being released on the juvenile charges demonstrated an inability to control his antisocial personality disorder. Although

9

he had married and found employment, Barnett committed additional violent offenses, including aggravated battery of a child. When he returned to prison, Barnett sold sexual favors for money. Then after being released from prison on these crimes, Barnett reoffended by sexually touching some teenaged girls under his grandmother's care, even though he was on parole and under some supervision. When discussing these new offenses in treatment, Barnett again downplayed his involvement, characterizing it as a one-time incident when the victims reported multiple instances of inappropriate contact.

These offenses occurred before Barnett completed the sex offender treatment program in April 2009. Dr. Kohrs acknowledged that sex offenders can change behavior and often benefit from sex offender treatment. But, even after completing the program—during which he acknowledged that the use of pornography encouraged his deviant behavior—Barnett committed a disciplinary offense of possessing an envelope of pornographic images. Again, Barnett downplayed his conduct, claiming he was holding the images for another inmate. Dr. Kohrs also noted that, while not criminal behavior, Barnett would often exploit his employment position in prison to demand canteen items from other prisoners in exchange for something they would otherwise have a right to receive, such as clean laundry. Barnett also demonstrated his continued inability to take responsibility for adverse actions. Though not related to any sexually deviant behavior, Barnett reported that he was fired from his employment because his phone was found in the chicken house. He did not take ownership of any wrongful conduct but intimated that someone other than himself placed his phone, which he had discarded, in the chicken house.

Barnett's expert, Dr. Nystrom, opined that the final test of any treatment program is whether the offender can apply what he learned in the program while living in the community. Dr. Nystrom indicated that he was not provided with any information suggesting that Barnett had reoffended during his 17-month release from state custody. Nevertheless, Dr. Nystrom also admitted that Barnett related that he always had a

chaperone when he went out in public. This was confirmed by Barnett's mother and by Barnett himself. Barnett's mother characterized Barnett's unwillingness to go anywhere alone as protection from accusations rather than protection from his own deviant behavior.

Aside from the constant monitoring Barnett had while released, Dr. Flesher found it significant that Barnett was released for 17 months. He indicated that offenders were statistically more likely to reoffend in the second 24-month period after release than in the first 24 months.

Barnett implicitly acknowledged that he had deviant tendencies regarding underage girls by noting that his triggers involved being around underage girls. He stated he learned not to go around places where underage girls frequented. Barnett's decision to avoid high-risk situations and maintain accountability by having a chaperone when he went out in public might be admirable if it were motivated by an attempt to control his offending behavior. But Barnett's testimony about the future undermined this motive. He testified that he intended to obtain a new residence away from his mother's house, where he could reside with his girlfriend. The evidence revealed that his girlfriend was an over-the-road trucker for a company based in Chicago. His girlfriend visited Barnett an average of once per month.

If Barnett's relapse prevention plan depended on him having another adult accompany him when he ventured out to public places, this former plan will be undermined by his new plan because he will essentially be living alone. For instance, if having an adult chaperone when leaving his home is no longer part of his prevention plan, Barnett's 17-month release—when he was consistently accompanied by another adult in public—affords no sound basis for predicting that he will be able to control his deviant behavior in the future. Indeed, based on his girlfriend's once a month visits, there certainly will be times when Barnett will leave home unaccompanied by another adult.

Thus, Barnett's new living plan will leave opportunities for injurious behavior in the future.

Past violent behavior is a strong indicator in predicting future violent behavior. See *Kansas v. Hendricks*, 521 U.S. 346, 357-58, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (citing *Heller v. Doe*, 509 U.S. 312, 323, 113 S. Ct. 2637, 125 L. Ed. 2d 257 [1993]; *Schall v. Martin*, 467 U.S. 253, 278, 104 S. Ct. 2403, 81 L. Ed. 2d 207 [1984]). Under equivalent circumstances, Barnett's more recent good behavior might be a stronger predictor of his future behavior than his past bad behavior. But the conditions in which he acted during his 17-month release are not the probable conditions in which he will act. The conditions under which he maintained good behavior really do not inform the court about his ability to control his antisocial personality disorder unassisted. He can control his dangerous behavior when he is incarcerated and supervised. He can control his dangerous behavior when he is not incarcerated but chaperoned. Nothing in Barnett's recent history counters the impression created by his criminal history that Barnett has serious difficulty controlling his deviant tendencies when unsupervised.

Considering the evidence in a light most favorable to the State, we conclude that the evidence establishes beyond a reasonable doubt that Barnett had serious difficulty controlling his deviant behavior. Thus, we affirm.

Affirmed.